[Crim. No. 2036. Second Appellate District, Division Two.—May 25, 1931.]

THE PEOPLE, Respondent, v. C. A. MARTIN, Appellant.

S. S. Hahn and Patrick F. Kirby for Appellant.

U. S. Webb, Attorney-General, Frank Richards, Deputy Attorney-General, Buron Fitts, District Attorney, and Frank Stafford for Respondent.

ARCHBALD, J., *pro tem.*—Defendant was charged by an information containing three counts with (1) violation of section 112 of the California Vehicle Act; (2) manslaughter, and (3) violation of section 141 of the California Vehicle Act. The jury returned a verdict of guilty on each count. From an order denying a motion for new trial and from the judgments of conviction entered upon said verdicts the defendant has appealed.

The case grew out of a collision which occurred on Crenshaw Boulevard in the city of Los Angeles on July 24, 1930, at about 7 o'clock P. M., when a Cadillac car in which the defendant was riding collided with a Ford coupe driven by one Germain Fourcade, who died as a result thereof, the three passengers in the car with him being rendered unconscious. The Cadillac was registered in the name of defendant's wife, and it was defendant's contention at the trial that he was in the rear seat drunk and asleep at the time of the collision and that the car was being driven by a man named Palmer, as defendant's operator's license had been taken away from him for driving a car while intoxicated some two months prior thereto.

Appellant contends that the orders and judgments should be reversed because the evidence is insufficient to justify his conviction (1) under count one, charging him with driving an automobile while intoxicated, (2) under count two, charging him with manslaughter, and (3) under count three, charging him with failure to render aid, etc.; (4) because the court unduly restricted cross-examination of the prosecution's witnesses, particularly Mrs. Bryan and Miss Neff; (5) because of misconduct of the court and because the court erred (6) in instructing the jury (7) in receiving the verdict under count one and fixing punishment there-

under, (8) in submitting a form of verdict to the jury under count one, (9) in sentencing defendant under count one, (10) in instructing the jury as to who are principals, and (11) in refusing to permit defendant to file an application for probation.

(1), (2), (3). Is there sufficient evidence to support the verdicts? Appellant's car was being driven north on Crenshaw Boulevard while decedent's car was proceeding south thereon. The witness Dr. Kessler was driving south on the same thoroughfare, about five or six feet west of the center of the street. As he approached the scene of the collision which is the subject of this action he observed a machine—"It was driving in an erratic sort of way, zig zagging, and I—and then it started toward me, and I tooted my horn to attract his attention, but it didn't seem to go—it didn't seem to do any good, so I tried to get out of his way." The witness then said that the machine struck the left-hand side and left rear of his car; that he stopped as soon as he could and then "I heard a smash back of me"; that when he got out of his car he saw the Cadillac headed into the right front and side of decedent's Ford coupe. Miss Esther Ronecker was riding north on Crenshaw Boulevard with her aunt, Mrs. Bryan, when the Cadillac passed them on the west half of the street and continued on until it struck the Ford. She testified that they were from 80 to 100 feet behind it at the time and that the car was going from 40 to 45 miles an hour when it passed them; that she observed a man and a woman in the front seat of the car, but could not say which of them was driving. Her aunt, Mrs. Bryan, testified that the Cadillac came so close that it nearly ran into her and that the Ford was within 10 feet of the west curb when it was struck; that there was a man and a woman in the front seat of the Cadillac and that she was "quite positive" the man was sitting at the wheel. Mrs. Bryan had previously testified, at the preliminary examination, that she was "not absolutely positive, but I believe a man was driving it." She could not, however, identify the man. It was stipulated that Crenshaw Boulevard is 80 feet wide at the place of the collision.

L. J. Mego, a witness for the prosecution, testified that he was riding in his car south on Crenshaw Boulevard and first

saw the Cadillac when it collided with the Ford; that he drove by the two cars and parked; that as he drove by he saw a woman sitting "in the right-hand side of the Cadillac in the front seat"; that it took about thirty seconds to stop his car and get out, and that as he walked around the east or right side of the wreck "there was a man on the street between the Cadillac and the curb [the driver's side of the Cadillac], walking toward the Ford". The man's back was toward him and he did not recognize him. Mego further testified that he did not see any other person in the Cadillac except the woman. Mrs. Mego was in the car with her husband. According to her testimony they were traveling along "right in back of the Ford, traveling the same way", and after they had passed the wrecked cars she got out and saw the defendant coming from the car toward her and about 15 feet from it. She observed his manner of walking and testified that "he staggered".

The witness W. J. Geer testified that he resides in a house on the same side of the street where the cars came together; that he heard "a small collision and then almost immediately a very big crash", and that he and the witnesses Mrs. Poole and Mrs. McMasters ran out of the house and saw the two cars together in front of a vacant lot just north of the house they were in; that he rendered some aid to the wounded, and that as he turned around he saw defendant staggering over the side steps of the witness' home, going away from the wreck; that he followed defendant and overtook him while he was attempting to get over the back fence; that he caught hold of defendant's coat tail "and pulled him back", the defendant saying, "Let me go, let me go;" that the defendant offered the witness his watch to let him go. The witness Cora A. Poole, who was in the house with Mr. Geer at the time and rushed out just ahead of him, testified that she rendered aid to a lady on the ground who had evidently been thrown from the Ford, and that as she turned around she saw the defendant "in front of the walk. He had not entered my grounds at all at the time;" that she took hold of his arm and told him she would call an ambulance, and that he said, "Oh, don't call an ambulance, Oh my wife," and "I am drunk;" that he then broke away from her; that she was "right at the curb"

and ''about ten feet from the Cadillac'' when she first saw him.

The witness Dennie Neff, who was riding in the Ford, testified that the last she recalled of the drive was ''that man's [defendant's] face. I remember seeing his face close to mine, either through a window or a windshield''; and apparently she had never seen him, unless she caught a fleeting glimpse of his face at the time of the accident.

Dr. Lopesitch, who gave defendant a sobriety test between 11 and 11:30 P. M. of the day of the occurrence in question, testified that he asked defendant ''if he was driving the car'', and that in response thereto ''he said yes''. It also appears from the evidence that defendant's wife told Doctor Lopesitch that she was driving the Cadillac. She testified, also, that her husband was in the back of the car at the time of the accident and did not drive at any time. Asked who was driving at the time she said: ''A party by the name of Palmer, who lives in our place. Q. The Court: What is his first name? A. I believe it was Adolph, or— Q. You believe it is what? A. Adolph Palmer.'' Defendant testified that his wife, Palmer and himself went to Venice that day and that they started drinking ''around four or five o'clock''; that both he and his wife were drunk; that Palmer, whose name he said was ''Rudolph'', might have had two or three drinks—''I did not see him take any more''; that a fight occurred over a card game, ''so then my wife told Mr. Palmer it was about time to get home and I don't remember—all I could do was to walk, so they took me and put me in the back seat''; that his next recollection was ''two fellows picking me up and setting me down on the running board''; that he didn't know where Palmer went that evening, but that he drove defendant home from the police station when he was released four or five days later. Defendant also told an officer that he (defendant) might say that he was the driver of the car if it would do his wife, who was then under arrest, or himself any good.

Two witnesses, Charles Goldberg and Ralph Alexander, testified for the defendant. Goldberg said that he and Alexander were driving north on Crenshaw Boulevard at the time and about 40 or 50 feet behind the Cadillac; that the accident occurred when they were ''directly opposite'';

that they parked their car "right opposite the accident"; that he "heard the crash" and "saw a man go sprawling out of the back end of the car—the door flew open and he came through with his hands and head first into the gutter, or the—I wouldn't say the gutter. He was on the right hand side of the car in the back seat. He went head first into the street." Goldberg also testified that he saw two people in the front seat at the time; that he and Alexander picked the man up and set him on the running-board of the Cadillac; that he saw him again in about three or four minutes sitting on the running-board and again after the ambulance left, and that he and Alexander took defendant to the home of a friend of the latter. Again, he testified that the Cadillac was 40 or 50 feet ahead of them when the crash occurred. The driver of the car in which Goldberg was riding was Alexander, who said he was practically behind the Cadillac, but on the right side of the boulevard going north when the two machines collided; that he parked his car as soon as he could and walked over to the accident, where he saw "a man laying at the side of the car, at the back door of the car"; "he was laying practically on the sidewalk, only his feet were in the car". Alexander also testified that the man was on the right side of the car and that they set him on the running-board; that it took them "a couple of minutes"; that he saw two people in the front seat of the car, but didn't observe whether they were men or women, and that by the time he got his car parked they were no longer in the machine. The evidence shows that the right-hand side of the Cadillac was not on the curb side of the car but was toward the middle of the street.

Apparently no one saw the man Palmer except the defendant and his wife, and the record is silent as to him except for their testimony and possibly, by inference, that of the witnesses Goldberg and Alexander; so the jury, if it believed the testimony of the Megos, who were in about the same proximity to the wreck, although going south, and who must have reached the scene as soon as Goldberg and Alexander, could have disregarded the testimony of all the defense witnesses. █ That being so, and considering the fact that defendant and his wife were admittedly intoxicated, that the Cadillac was performing as it might with

an intoxicated person at the wheel, the fact .that several people, including the Megos, saw a man and a woman in the front seat and did not see any other person in the car, that the defendant was seen, apparently by himself, on the left of the Cadillac going from the car toward the sidewalk almost immediately after the accident and endeavored to leave the scene of the accident through Mrs. Poole's yard, that he offered his watch to Mr. Geer, saying, ''Let me go,'' the fact that Mrs. Martin, defendant's wife, said she was driving the car and neither herself nor defendant saying anything about ''Palmer'' driving the car until the time of the trial, together with other evidence from which the jury was warranted in finding that Fourcade's death resulted from the negligence of defendant, this court cannot say that the verdict as to counts one and two are not amply sustained by the record.

It is undisputed that the Cadillac came to a stop at the scene of the accident and remained there until the injured persons were taken away, and that the occupants of the Ford were all rendered unconscious and were promptly removed from the scene in ambulances. It also appears that one of the first men on the spot was the witness Dr. Kessler, who gave first aid to the injured. While defendant did not give his name and address and registration number nor exhibit his operator's license to the driver of the Ford or to any of its occupants, or render any assistance to the injured, yet under the circumstances all of those acts would not seem to be required of him, so the evidence would not seem to justify the verdict. as to count three. (*People* v. *McIntyre,* *(Cal. App.) 229 Pac. 675; *People* v. *Scofield,* 203 Cal. 703 [265 Pac. 914].) As to such count the court in our opinion should have granted the motion for a new trial, even assuming there was evidence under which the jury might have found a verdict of guilty in not rendering assistance to the injured persons, as the jurors were not instructed that they must agree on at least one of the separate offenses alleged in count three in order to find defendant guilty on that count. Even though no such instruction was requested by defendant on that count, there being several offenses alleged upon which he could not

have been so found guilty, such an instruction should have been given. (*People* v. *Scofield, supra*.) ▮ After a careful examination of all the evidence we fail to see any merit in appellant's contention (4), that the court unduly limited the cross-examination of any of the witnesses, or (5), that the court was guilty of misconduct in any way.

▮ Appellant's contentions (6) to (9), inclusive, involve the verdict rendered on count one of the information and are treated together in his brief. The court instructed the jury that if it found the defendant guilty under said count one they were required under the law to fix the punishment, and that the court in imposing sentence had no authority to impose one greater than that recommended by the jury. The instruction then advised that "the punishment for the offense as prescribed by the law, and which you must recommend in your verdict", might be imprisonment in the county jail, etc., or in state prison for not less than one year or more than three years, or a fine of not less than $200 nor more than $5,000, but must be either imprisonment or a fine and not both. The verdict returned on such count recommended "imprisonment in state's prison for one year". The judgment pronounced, so far as material here, reads: "Whereas the said C. A. Martin, having been duly found guilty in this court of the crime of violation of section 112, California Vehicle Act, a felony, as charged in Count I of the information; it is therefore ordered, adjudged and decreed that the said C. A. Martin be punished by imprisonment in the State's Prison of the State of California at San Quentin for the term prescribed by law." It will be seen that the court did not follow the recommendation of the jury in its judgment, but proceeded as if the case were one falling within section 1168 of the Penal Code. Such section applies only to cases where the imprisonment "is now prescribed by law". Under section 112 of the California Vehicle Act, the minimum and maximum limits of punishment are prescribed, but the section also provides that "the jury shall recommend the punishment and the court in imposing sentence shall have no authority to impose a sentence greater than that recommended by the jury". It would seem under the plain language of the section that the sentence must be imposed by the court, as it is not prescribed by law; and it is also to be noted that there is no limitation on the court except that of not im-

posing a sentence in excess of the recommendation—implying necessarily that one may be imposed that is less than the maximum recommended—and consequently the judge may exercise his discretion. (*People* v. *Ray,* 92 Cal. App. 417, 421 [268 Pac. 382].) The court in the instant case not having imposed any sentence and the law not prescribing one, the judgment rendered on count one would seem to be void.

(10) The court instructed the jury that "all persons concerned in the driving of an automobile upon a public highway while under the influence of intoxicating liquor as charged in count I of the information, whether they directly commit the act constituting the offense or knowingly and intentionally aid and abet or promote, encourage and advise its commission, are principals in the crime committed and equally guilty thereof". Appellant urges that such instruction was prejudicial. He argues that' if the jury believed defendant's story that he was drunk and asleep in the back seat and that Palmer did the driving, and should conclude that the latter was intoxicated, they might have convicted the defendant under the instruction on the count charging manslaughter. We must assume that the jury was composed of men and women of at least ordinary intelligence and discernment, and therefore under the evidence they could come to but one of two conclusions: (1) That defendant was driving the car while intoxicated or (2) that some other person, either his wife or the mysterious Mr. Palmer, was driving it and defendant was in the back seat at all times in a drunken stupor. If they believed the latter defendant could not possibly have *knowingly and intentionally* aided or abetted, promoted, encouraged or advised the commission of any offense except that charged in count one, to which the instruction seems directed, and the jurors were properly instructed by the court that if they believed from the evidence beyond a reasonable doubt that defendant was operating his car while intoxicated, as that term was defined to them, and that such condition caused him to so operate his car that the death of Fourcade was caused thereby, they should find him guilty of manslaughter. They were also instructed that if the evidence was equally susceptible to two interpretations, one

pointing to defendant's innocence and the other to his guilt, the defendant should be given the benefit of the one pointing to his innocence. We fail to see how the jury could have been misled by said instruction.

(11) The defendant asked permission to file an application for probation, which was denied by the court. The court had heard all the evidence and hence was in a position to say whether or not the case was one in which probation should be allowed. The facts disclosed that a man who a short time before had been guilty of driving an automobile while intoxicated and whose license was suspended by the court, and who had no right to drive, insisted on driving nevertheless, in an intoxicated condition, with the result that one person lost his life and three others were seriously injured. The court in answer to the application said: "The court is familiar with the case and knows all about it, has heard the evidence at great length, and from such evidence the court would not grant probation in the case. It is not a probation case." The court then reviewed the evidence and made the statement to which counsel for appellant points as an abuse of the discretion which is unquestionably committed to the court by section 1203 of the Penal Code. We cannot, however, come to the conclusion that the court, in view of all that was said, meant the language as it reads, and we cannot see that it departed from legal principles in denying the application for probation in this case, but did "summarily deny probation", as authorized by the section.

Appellant has specified several other alleged errors, but as they are not argued in his brief and are covered to some extent by the arguments on the other contentions made we are not considering them here.

As to count I the order denying the motion for a new trial is affirmed, but the judgment thereon is reversed, with directions to the court to again arraign defendant on said count and pronounce judgment thereon according to law and the verdict of the jury. As to count II the judgment and order are affirmed. As to count III the judgment and order are reversed.

Works, P. J., and Craig, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 9, 1931, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 22, 1931.